ROBERT FIRTH *vs.* JOHN W. RICH & another.

Suffolk. March 15, 1901. — May 24, 1901.

Present: HOLMES, C. J., LATHROP, BARKER, HAMMOND, & LORING, JJ.

*Negligence*, In driving.

In an action against a teamster for injuries to the plaintiff caused by being thrown from the back of a covered one horse wagon of the defendant, it appeared, that the defendant had been employed by a carpenter for whom the plaintiff worked, to transport some materials from a building to the carpenter's shop, and that the plaintiff got into the wagon at the invitation of the driver and of his employer, that the wagon stopped about five feet from the door of the shop, there being another team in the way, and the plaintiff was standing in the back of the wagon and was about to hand out a box to his employer, when the horse started and he was thrown out. The horse probably was started by the driver in trying to get his wagon to the right place in front of the shop door, the other team having moved away. *Held*, that there was no evidence of negligence on the part of the driver. The facts that the wagon moved and that the plaintiff, with-

out the driver's knowledge, happened to be standing in such a way as to lose his balance when it started, would not justify a finding that the driver was negligent. There was nothing that required the driver to give notice that he was going to move forward five feet.

TORT to recover for injuries to the plaintiff, by being thrown out of a wagon of the defendants through the alleged negligence of the defendants' driver. Writ dated June 15, 1899.

At the trial in the Superior Court, before *Gaskill*, J., it appeared, that at the time of the accident the plaintiff was a carpenter in the employ of one Bates, a jobbing carpenter, who was the proprietor of a carpenter shop at 64 Broad Street in Boston. The defendants were co-partners, under the name of Rich and Company, conducting a teaming and trucking business in Boston.

Bates, called as a witness by the plaintiff, testified, that at the time of the accident he employed four men; that the plaintiff had been employed by him for about two years and was in his employ at the time of the accident; that the witness had been acquainted with the defendants about five years, and when he had any teaming he called on them to do it, and they sent him a monthly bill.

The counsel for the defendants stated that he did not contend that the defendants were servants of the witness. It was admitted that when Bates wanted any teaming done he said so, and a bill was sent in at the end of the month for what had been done. The defendants furnished the teams with drivers. Bates exercised no control over the drivers except to tell them where he wished to go.

The witness further testified, that the defendants had one team at the stand on Broad Street, which was the team used by the witness; that they had other teams at other stands; that on the day of the accident the plaintiff was working at No. 76 Pearl Street in Boston, the back part of which was on Hartford Street; that the witness got the defendants' team, which had its stand on Broad Street, to go to Hartford Street; that the plaintiff had finished his job at Hartford Street when the witness and the driver got there; that the team was a one horse covered wagon; that it belonged to the defendants; that it was an ordinary sized wagon about the size of an express wagon;

and that the cover of the wagon was rounded at the top corners. The driver was in the employ of the defendants.

When the witness got the team to go to Pearl Street, he got on the wagon with the driver and went with him. The witness further testified, that they then went to Hartford Street; that the driver drove the team; that after reaching Hartford Street the witness got off, got into the elevator and went up into the loft, got his stock that was left from the job and brought it down on to the first floor and put it on the team; that they put on to the team some four or five matched boards, a piece of joist and a box of tools; that the box of tools was a small hand box that one could carry handily on small jobs; that the boards were sixteen feet long and ten inches wide; that the joist was ten to twelve feet long and three inches wide by two inches thick; that he could not state who put the things into the wagon; that after the materials were loaded on, he got on to the seat with the driver, and the plaintiff got into the body of the wagon; that they then went to the witness's shop on Broad Street. The driver did the driving. The plaintiff rode in the back part of the team. The witness thought the plaintiff sat on the back edge of the seat facing towards the rear of the wagon. When they reached the shop, the team drove up within about five feet of the shop door. "In front of it was an express wagon, an American Express wagon, so that we could go no farther. I got off my side and passed around the wagon to the back of it to take Mr. Firth's box of tools. As he went to pass them to me he came out of the wagon, the horse started, he came out of the wagon and down on the street on to the paving; came down standing."

The witness further testified, that when they drove up within five feet of the door of the witness's shop and found the American Express team in front of them, the driver of the American Express team was not in his wagon; and that the witness did not see him. The street at that time was paved with granite. The plaintiff was passing out his hand box of tools at the time that he was thrown out.

The witness further testified, that when the plaintiff was thrown out, or at the moment before he was thrown, the witness judged that the plaintiff was about to get out of the wagon; that the plaintiff was back to the horse; that the tools

the plaintiff passed out came down with him. The express team when, or after, the plaintiff had fallen out, was pulled out into the street.

" *Q.* And what was the defendants' team doing after Mr. Firth was thrown out? *A.* He simply started ahead about five feet — five or six feet — and stopped. — *Q.* So as to bring the team precisely in front of your door? *A.* Yes, sir."

The American Express team had been pulled out of the way.

The plaintiff testified as follows: that he was a carpenter; that he was sixty years of age; that he had worked for Bates for about two years before the accident; that the accident occurred on March 8, 1899; that on that day he was working in a building on Hartford Street; that he finished the job about noon; that just before noon they carried down on the elevator the things left after the completion of the job; that there were some pieces of lumber, a box of nails, a step ladder, two saw horses, and some tools; that the tools belonged to the plaintiff and the rest of the things to Bates; that after getting the things on the sidewalk the defendants' driver, Bates and the plaintiff together loaded them on to the defendants' team.

" *Q.* And then what occurred? *A.* They got into the team — Mr. Bates and the teamster got on and asked me to get on. — *Q.* Which one asked you to get on? *A.* They both asked me. I was going to walk to the shop; my tools were in the wagon and I was going to walk, and they said, ' Get in and ride.' "

The plaintiff further testified, that he got into the wagon and sat on the back part of the seat facing toward the back of the wagon; that Bates and the driver sat on the front of the seat, one on each side of him. " When we got to Broad Street the team drove up as far as he could; an express wagon stood ahead of him. Mr. Bates got off and the driver got off, one on each side, and I sat — passed the stuff from where it was piled in the wagon to the tail of the wagon, where it would be handy to pass out, and when I got it there I stepped to pass it out to Mr. Bates. Mr. Bates was at the tailboard of the wagon, standing on the ground, and I was inside. I was facing out, at the rear of the wagon. And in the act of reaching down to pass him some things — I think it was a box of nails — was the first thing

I had; I reached down to pass it to him, and out I went; the team started and out I went. And as I went out, slid out over the tailboard, I went down pretty heavy. Mr. Bates throwed his arm and kind of prevented me from falling forward, and I struck right on my heels, on the hard paving.

" *Q.* Now, after striking on your heels on the pavement, Mr. Firth, what did you do? *A.* When Mr. Bates released me, I walked up and leaned agin the building. — *Q.* Standing on the sidewalk? *A.* Yes, on the sidewalk. I walked up and leaned agin the side of the building. — *Q.* What did you see then? *A.* I see the driver have the horse by the head and leading him out into the street. — *Q.* And what did he do? *A.* He was having some strong words with the driver of the other wagon at the time."

At the conclusion of the testimony introduced by the plaintiff, the judge, on motion of the defendants, directed the jury to return a verdict for the defendants; and the plaintiff alleged exceptions. The plaintiff also took two exceptions to the exclusion of evidence offered by him, but the decision of the court has made them immaterial.

*E. I. Baker*, for the plaintiff, submitted the case on a brief.

*W. I. Badger*, for the defendants.

Holmes, C. J. This is an action for personal injuries. The plaintiff was a carpenter employed by one Bates. Bates employed the defendants to carry some materials from a building where he had been working to his shop. It is admitted that they were not fellow servants with the plaintiff. The wagon used was a covered one horse wagon. Bates got in, and then the plaintiff got in by invitation of the driver and Bates. When they reached the shop, the wagon stopped about five feet from the shop door, there being an American Express wagon in front which prevented their getting nearer. The driver and Bates got out, and the plaintiff was standing in the rear of the cart about to hand out a box of tools to Bates, when the horse moved forward and the plaintiff lost his balance and went out, lighting on his heels and being badly hurt. The evidence is obscure as to how the accident happened. Bates testified that after the plaintiff was thrown out the driver simply started ahead about five feet, so as to bring his team in front of the shop door, that

the American Express wagon had been pulled out of the way, and that the driver of the express wagon was not with it at the moment of the accident but came out of a neighboring store after the plaintiff was hurt. At the trial the judge directed a verdict for the defendants, and the plaintiff excepted.

All the testimony relates to a state of things at a time, it is uncertain how long, after the accident, so that it is something of a strain to say that the jury fairly might have inferred that the driver moved the horse rather than that the horse moved of itself without anybody's fault. But if it may be said on the whole to be more probable that the driver started the movement from the beginning, as he certainly controlled it at the end, it is hard to say that he was negligent in doing so. It does not appear, and it is not likely, that he could see the plaintiff. The start followed very shortly upon the first stop, and the first stop evidently was not at the exact point to be reached. It would be extravagant to decide that a driver on reaching his destination and wishing to get his wagon into the right place must go to the rear of the wagon in order to see that no one is in a position to be hurt by such a usual, slight movement; and in view of what we know of daily life it would be academic to require him to give notice that he is going to move forward five feet, when he has no reason to suppose that any one is in a dangerous position. There was no violent start, — nothing but the fact that the wagon moved, and that the plaintiff, without the driver's knowledge, happened to be standing just in such a way as to lose his balance and to go out. Taking into account the rather dim representation of the case given us by print, we cannot say that the judge who heard it all was wrong.

*Exceptions overruled.*